NOT DESIGNATED FOR PUBLICATION

No. 127,182

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BOBBY C. STARK,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID DAHL, judge. Submitted without oral argument. Opinion filed August 7, 2026. Affirmed in part, reversed in part, and vacated in part.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before COBLE, P.J., BRUNS and HURST, JJ.

PER CURIAM: Bobby C. Stark appeals after a jury convicted him of attempted first-degree murder, aggravated burglary, and aggravated battery. On appeal, Stark contends that the district court erred by failing to suppress evidence relating to a witness' identification of him as the assailant; that the district court erred by excluding evidence of the victim's drug or alcohol use; that the State presented insufficient evidence to support his aggravated burglary conviction; and that the district court erred by failing to give a lesser included offense instruction for a lesser degree of aggravated battery. Based on our review of the record on appeal, we affirm Stark's convictions for attempted first-degree

1

murder and aggravated battery. However, we find that the State failed to present sufficient evidence as to one of the essential elements of aggravated burglary. Thus, we affirm in part, reverse in part, and vacate Stark's sentence for aggravated burglary.

FACTS

During the summer of 2019, Michael Ellis was remodeling a house in Wichita. Because he was behind schedule, Ellis hired Daniel Phenneger and Anja Altergott to help with the project. On June 20, 2019, Phenneger introduced Ellis to a friend who was identified at trial as Stark. Phenneger told Ellis that Stark was skilled with hanging drywall. So, Ellis offered him a job and thought Stark would come back later that night or the next morning to help with the remodeling.

That afternoon, Phenneger left the house being remodeled at about 5 or 6 p.m. to go to a casino with Stark. According to Ellis, he expected Phenneger to come back and help after that. While Phenneger was gone, Ellis and Altergott continued to work on the house. Phenneger arrived back at the house close to midnight and began working. Around 2 a.m. on June 21, 2019, the three coworkers took a break. As they sat in the southeast bedroom of the house talking, Altergott heard a noise and said: "'What is that?'"

Ellis, Altergott, and Phenneger realized the noise came from the front door. According to Phenneger, he was expecting Stark to stop by the house to borrow $20. Altergott saw a man in the doorway and then turned away briefly to look at Phenneger. When she looked back, she saw the man at the doorway lunging at Ellis and repeatedly striking him in the head and the face with a hatchet. At trial, Altergott testified that the man hit Ellis eight or nine times in a just a few seconds. She also testified that the man was hitting him very hard and it looked to her "like he was trying to kill [Ellis]."

2

Altergott started screaming, and the man stopped hitting Ellis with the hatchet. The man then turned toward her, waived the hatchet in her face, and told her to get on the floor. According to Altergott, she heard the man say: "'Now I'm going to have to kill both of them.'" At trial, Altergott, Phenneger, and Ellis each testified that they believed the man to be Stark.

Around the same time, Phenneger told Stark to get out of the house. In response, Stark told Phenneger he wanted money and that he needed to get rid of the witnesses. Phenneger then told Stark that he "would make sure everything was taken care of and he could just leave the house." Ellis testified at trial that he heard Phenneger tell Stark: "'No, you don't need to go any further. We're not going to say anything.'" After Stark said he needed money, Altergott told him that her purse was in the other room. At that point, Stark left the room, took a few dollars from Altergott's purse, and left the house.

In describing the attack at trial, Ellis testified that he suddenly felt pain in the back of his head. He then saw Stark moving in front of him with a hatchet in his hand. Ellis testified that Stark hit him in the face with the hatchet about eight times. In addition to suffering injuries to his face and head, a couple of Ellis' fingertips were cut off as he attempted to block the blows from the hatchet with his hands. When asked if he was sure that Stark was the man who attacked him, Ellis testified: "It's 100 percent he did it."

After Stark left the house, Phenneger and Altergott helped get Ellis into a truck. In describing Ellis' injuries, Phenneger testified that he was "holding [Ellis'] face together" and that it "looked pretty detached." In addition, Altergott testified that she could not make out Ellis' facial features because of the slice marks caused by the hatchet. After getting Ellis into the truck, they drove him to the hospital.

As a result of the attack, Ellis suffered serious injuries to his face. These injuries included a severed nose as well as a broken orbital socket. A surgeon rebuilt Ellis'

3

sinuses, his nose, his septum, and the orbit of his eye. This required three plastic surgeries and the placement of multiple plates with screws. Ellis also suffered injuries to his hands, including the tips of several fingers being cut off. In describing his injuries at trial, Ellis testified that they were "life changing."

At the hospital, neither Phenneger nor Altergott initially identified the attacker when speaking to the police. However, a few hours later, the investigating officers asked Phenneger and Altergott to look at photo lineups to see if they recognized the person that attacked Ellis. Phenneger identified Stark—who was depicted in photograph number 4—and gave the police Stark's name. At trial, Phenneger explained that he did not initially identify Stark because he did not want to get his friend into trouble. Phenneger also testified that he had known Stark for about eight years.

When Altergott looked at the photo lineup, she initially indicated that she did not recognize anyone. But after looking at the six photographs again, she said that the first three and the last two were not the person who attacked Ellis. Altergott said she believed the man depicted in photograph number 4 was the assailant, but she noted that the man who attacked Ellis did not have any hair.

Subsequently, Altergott talked to a detective on the phone and said she was not certain about her identification. At the preliminary hearing, when Altergott was asked if Stark was the attacker, she explained that she needed her glasses, which she did not have with her at the hearing. Still, she responded: "I believe so." At trial, Altergott testified that despite her initial hesitancy, she was now "certain" that Stark was the man who attacked Ellis.

When Altergott was asked at trial whether she felt pressured to pick out a person from the photo lineup, she responded:

4

"No. They told me that there was a possibility that the person wasn't even pictured, but I felt strongly enough about number four . . . looks like the guy. This looks just like the guy except for the hair. The hair is what was tripping me up more than anything at that moment."

At the hospital, Ellis was also unable to identify his attacker. However, the officer who spoke with him at the hospital testified at trial that he had concerns about Ellis' ability to make an identification at that point because he "kept slipping in and out of consciousness . . . ." The officer also testified that Ellis had blood running across the one eye that was not covered.

At trial, Ellis testified that he was 100 percent certain that Stark was the man who attacked him. On cross examination, Ellis admitted that he did not remember if Stark was bald. Although he remembered that the attacker had a tattoo above his eye and cheek, he had no specific recollection of the tattoos. Ellis also testified that he had seen Stark for only about 20 minutes on the day before the attack.

The State charged Stark with attempted first-degree murder, aggravated burglary, aggravated battery, and aggravated robbery. On September 12, 2022, the district court commenced a three-day jury trial. In its case, the State presented the testimony of seven witnesses including Phenneger, Altergott, and Ellis. The defense presented the testimony of three witnesses—including Stark.

According to Stark, he was not in Wichita at the time the crimes were committed. He also testified that he never talked to or worked for Ellis. According to Stark, he was living in Dodge City at the time of the attack. Nevertheless, Stark acknowledged that he had known Phenneger since 2007 and had some contact with him earlier in 2019. Still, Stark claimed he did not have contact with Phenneger in June 2019. Moreover, Stark denied any involvement in the attack on Ellis.

After deliberation, the jury found Stark guilty of attempted first-degree murder, aggravated battery, and aggravated burglary. However, the jury acquitted Stark of the charge of aggravated robbery. On September 28, 2023, the district court sentenced Stark to 653 months in prison.

Thereafter, Stark filed a timely notice of appeal.

ANALYSIS

*Eyewitness Identification*

On appeal, Stark challenges the district court's decision to deny his motion to suppress Altergott's eyewitness identification. Specifically, Stark argues that the eyewitness identification was unnecessarily suggestive and violated his due process rights. But—as the State points out—Stark failed to preserve this issue for appeal by contemporaneously objecting to the admission of the evidence at trial.

Generally, when a district court has denied a motion to suppress, the moving party must object to the introduction of that evidence at the time it is offered at trial or—in the alternative—assert a standing objection to preserve the issue for appeal. *State v. Crudo*, 318 Kan. 32, 38, 541 P.3d 67 (2024); see also K.S.A. 60-404. Whether an issue has been preserved for appellate review is a question of law over which our review is unlimited. *State v. Campbell*, 308 Kan. 763, 770, 423 P.3d 539 (2018). Here, a review of the record reveals that Stark failed to make a contemporaneous objection when the State attempted to introduce evidence of Altergott's eyewitness identification at trial. Likewise, he did not assert a standing objection regarding this evidence.

It is undisputed that the district court denied Stark's pretrial motion to suppress Altergott's eyewitness identification after an evidentiary hearing. In denying the motion,

the district court twice informed Stark—who was appearing pro se at the time—that "these are things you can argue at the time of trial." When the case proceeded to trial, Stark elected to be represented by counsel. However, defense counsel did not object when Altergott identified Stark in court.

Defense counsel also did not object when a police officer testified regarding Altergott's review of the photo lineup. In fact, the record reflects that the only time that the issue was raised before the district court was after Stark was convicted. In particular, Stark's attorney informed the district court that her client would like to add an argument to his written motion for a new trial regarding the suppression of Altergott's eyewitness identification.

K.S.A. 60-404 provides: "A verdict . . . shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reasons of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." See *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009). Although Stark recognizes the contemporaneous objection rule, he suggests that the district court effectively granted him a continuing objection by assuring at the suppression hearing that the issue was preserved for appeal. Stark further claims that a failure to consider this issue would constitute a denial of due process.

At the suppression hearing, the district court commented that Stark was "preserving it as an issue on appeal" and, as such, Stark claims the district court essentially granted him a continuing objection. However, earlier in the hearing, the district court told Stark that he would be able to reassert this issue at trial. As the Kansas Supreme Court has recognized, the rationale underlying the contemporaneous objection rule and K.S.A. 60-404 is met if the district court grants a request for a continuing

7

objection as to the evidence. See *State v. Parker*, 277 Kan. 838, 844-45, 89 P.3d 622 (2004).

After reviewing the record, we find that the district court did not grant Stark a continuing objection during the suppression hearing or anytime thereafter. In making the pretrial ruling on the evidence, the district court noted that Stark could reassert the issue at trial and made a reference to "preserving it as an issue on appeal," but the district court did not state that it was granting Stark a continuing objection. At trial, defense counsel had an opportunity to ask for a continuing objection and assert a contemporaneous objection.

Here, no objection to the evidence was made at trial. Furthermore, the district court did not explicitly grant Stark a continuing objection. Over the past several years, the Kansas Supreme Court has emphatically and consistently held that the contemporaneous objection rule—as set forth in K.S.A. 60-404—is to be strictly enforced. *State v. Sinnard*, 318 Kan. 261, 282, 543 P.3d 525 (2024). Referring to K.S.A. 60-404 as a "legislative mandate," our Supreme Court has held that the statute "permits only one outcome regarding unpreserved evidentiary challenges:  that the challenge will not be the basis for setting aside the verdict or reversing the judgment." 318 Kan. at 282. Likewise, in *State v. Showalter*, 318 Kan. 338, 345, 543 P.3d 508 (2024), our Supreme Court held that even when a district court makes a pretrial evidentiary ruling, counsel still must lodge a timely and specific objection at trial. The purpose is to let "the district court to consider as fully as possible—in context—whether the evidence should be admitted, which reduces the chances of using tainted evidence and thus avoids possible reversal and a new trial." 318 Kan. at 345-46.

Although Stark cites *State v. Hunt*, 275 Kan. 811, 813, 69 P.3d 571 (2003), which found that an exception to the contemporaneous objection rule should be applied to an impermissibly suggestive identification, he acknowledges that *Hunt* was decided before

the holding in *King*. Stark also cites *State v. Richmond*, 289 Kan. 419, 430, 212 P.3d 165 (2009)—decided shortly after *King*—to argue for the continuing viability of the exceptions to preservation requirements. But in more recent cases, our Supreme Court has refused to apply such exceptions to bypass the clear legislative mandate set forth in K.S.A. 60-404. See *State v. Scheetz*, 318 Kan. 48, 59, 541 P.3d 79 (2024) (stating that K.S.A. 60-404 does not allow those exceptions to come into play in the context of the admissibility of evidence); see also *Sinnard*, 318 Kan. at 282 (finding that the requirement of a contemporaneous objection set forth in K.S.A. 60-404 is a "legislative mandate" that must be complied with).

In *State v. Calderon-Aparicio*, 44 Kan. App. 2d 830, 841-42, 242 P.3d 1197 (2010), this court rejected a similar argument that a suggestive identification procedure was an issue of due process that should justify appellate review even though the defendant had not preserved the issue. In rejecting this argument, the *Calderon-Aparicio* court found—based on the plain language of K.S.A. 60-404 and our Supreme Court's holding in *King*—that a failure to contemporaneously object at trial precluded review. *Calderon-Aparicio*, 44 Kan. App. 2d at 843.

In addition, Stark cites a termination of parental rights case that he suggests supports his position. In the case of *In re A.S.*, 319 Kan. 396, 407, 555 P.3d 732 (2024), the Kansas Supreme Court found that due process required that the child's father "be able to testify, communicate with counsel, and otherwise fully participate in the termination of parental rights hearing." Because the father—who was in federal prison—was not afforded these rights, our Supreme Court held that he had been denied due process. 319 Kan. at 408-09.

Of course, due process requires a reasonable opportunity to be heard "'at a meaningful time and in a meaningful manner.'" *State Juarez*, 312 Kan. 22, 24, 470 P.3d 1271 (2020). In this case—unlike the father in *In re A.S.*—Stark was present at trial, was

9

represented by counsel, testified as a witness, and otherwise participated in his defense. As a result, Stark had a reasonable opportunity to object at trial to the introduction of evidence relating to Altergott's eyewitness identification. Finally, because this is an evidentiary issue that requires a timely and specific objection for preservation, we find that the lack of a contemporaneous objection at trial precludes our review.

*Cross-examination of the Victim*

Next, Stark contends that the district court erred by limiting his cross-examination of Ellis regarding whether he was under the influence of alcohol or drugs on the night of the attack. At trial, the State objected to this line of questioning, and the district court found that it was more prejudicial than probative. On appeal, Stark argues that the district court's evidentiary ruling limiting his ability to cross-examine Ellis denied him the opportunity to fully confront the witnesses against him.

Even if evidence is otherwise relevant and material, a district court has the discretion to exclude it where the probative value of such evidence is outweighed by its potential for producing undue prejudice. See K.S.A. 60-445; *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). We review a district court's ruling that evidence is more prejudicial than probative for an abuse of discretion. *State v. Alfaro-Valleda*, 314 Kan. 526, 535, 502 P.3d 66 (2022). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Younger*, 320 Kan. 98, 137-38, 564 P.3d 744 (2025).

Here, the record reflects that defense counsel argued to the district court that she wanted to cross-examine Ellis about drug paraphernalia "removed . . . from his property" at the hospital and a toxicology report showing that he tested positive for methamphetamine and opiates. Defense counsel explained that she wanted to delve into these matters in order to inquire of Ellis about whether he was under the influence that

10

night and if this may have affected his ability to remember what happened during the attack.

The State objected to this line of inquiry because without a toxicology expert, the evidence would be unduly prejudicial because Ellis would not be able to testify regarding the extent—if any—he may have been impaired when he was attacked. The district court agreed with the State and ruled that the evidence was inadmissible because "it is more prejudicial than probative . . . ." After Stark was convicted, he raised this issue again in his motion for new trial—arguing that the evidence was relevant to whether Ellis was able to accurately recall the attack—which the district court denied.

On appeal, Stark argues that the district court's evidentiary ruling was both unreasonable and based on a factual error. Stark also suggests that the district court violated his right to confront the witnesses against him because this line of questioning goes to Ellis' credibility. See *State v. Thomas*, 307 Kan. 733, 738, 415 P.3d 430 (2018). To the extent that Stark is now attempting to raise a constitutional argument for the first time on appeal, we find that it is not properly before us for review. *State v. Holley*, 315 Kan. 512, 524, 509 P.3d 542 (2022); see also Supreme Court Rule 6.02(a)(5) (2026 Kan. S. Ct. R. at 36) (requiring appellant raising an issue for the first time on appeal to state why it should be considered for the first time on appeal). As such, we will confine our review to the argument raised by Stark to the district court.

A review of the record reveals that the district court specifically excluded the evidence on the basis that defense counsel's line of questioning was more prejudicial than probative. Under K.S.A. 60-445, the district court may exclude otherwise admissible evidence if its probative value "is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered." As our Supreme Court has found, the following factors should be considered when considering probative value: "(1) how

11

clearly the acts were proved; (2) how probative the evidence is of the material fact sought to be proved; (3) how seriously disputed the material fact is; and (4) whether the government can obtain any less-prejudicial evidence." *State v. Satchell*, 311 Kan. 633, 641, 466 P.3d 459 (2020) (citing *State v. Boysaw*, 309 Kan. 526, Syl. ¶ 8, 439 P.3d 909 [2019]). Then, in determining undue prejudice, the court should consider: "(1) the likelihood that the evidence will contribute to an improperly based jury verdict; (2) whether the evidence will distract the jury from the central trial issues; and (3) how time consuming it will be to prove the other conduct." *Satchell*, 311 Kan. at 641 (citing *Boysaw*).

Here, while it is true that Ellis' identification of his attacker was relevant and material, his testimony was corroborated by other eyewitnesses who testified under oath at trial. Both Phenneger—who had known Stark for a number of years—and Altergott identified Stark as the person who attacked Ellis with a hatchet. Moreover, they testified in detail regarding the events that happened that night.

It is undisputed that Phenneger and Stark knew each other for about eight years. In addition, Phenneger testified that he introduced Stark to Ellis the day before the attack. Furthermore, Phenneger testified that he had spent time with Stark in the hours before the attack. So, although the evidence the defense wanted to present may have discredited Ellis' identification or his ability to recall with certainty the events surrounding his being struck repeatedly in the face with a hatchet while attempting to protect himself, his identification was corroborated by the identification of two other eyewitnesses. And one of those eyewitnesses had known Stark for many years.

We find that Stark has failed to show that the district court abused its discretion in excluding evidence that Ellis may have been under the influence of drugs or alcohol at the time he was attacked. Moreover, the jury heard Ellis' testimony that he was taking a break from work at about 2 a.m. with Altergott and Phenneger, and he had been dozing

off. He also testified that he awoke to a pain in the back of his head. Ellis candidly admitted that he did not know what was going on until Stark moved in front of him with a hatchet in his hand and started hitting him in the face.

At most, defense counsel proffered evidence at trial that Ellis may have used drugs or alcohol on the night of the attack. She did not proffer any evidence to support the theory that Ellis was under the influence or that his ability to identify his attacker was impaired. Likewise, even without Ellis' testimony, there was sufficient evidence presented by the State from other witnesses that the jury could rely upon to find that Stark was the person who was the attacker.

Finally, even if we were to assume that the district court's ruling was erroneous, any such error would be harmless. Under K.S.A. 60-261, the erroneous admission or exclusion of evidence is subject to review for harmless error. See *State v. Shields*, 315 Kan. 814, 832, 511 P.3d 931 (2022). When applying the harmless error test, we must determine if there is a reasonable probability that the alleged error impacted the outcome of the trial considering the entire record. *State v. Campbell*, 317 Kan. 511, 518, 532 P.3d 425 (2023).

As previously discussed, two other witnesses corroborated Ellis' identification as well as the version of events on the night of the attack. As such, we see no reasonable probability that preventing defense counsel from inquiring about whether Ellis was under the influence of drugs or alcohol would have impacted the outcome of the trial. Under these circumstances, we find that Stark's right to a fair trial was not violated by the district court's evidentiary ruling.

*Sufficiency of Evidence*

Stark also contends that the State presented insufficient evidence to sustain his conviction for aggravated burglary. Specifically, he argues that the State presented insufficient evidence to support the jury's finding that he was not authorized to remain in the house. Based on our review of the record, we agree.

When defendants challenge their convictions on he grounds of insufficiency of the evidence, we must review the record to determine if the State proved each element of the offense. See *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024). In doing so, we "review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt." 319 Kan. at 723. It is not our role to reweigh evidence, to resolve evidentiary conflicts, or to pass on the credibility of witnesses. 319 Kan. at 723.

To prove the charge of aggravated burglary in this case, K.S.A. 2018 Supp. 21-5807(b) required the State to prove that Stark remained within a specified building or vehicle "without authority." Consistent with the statute, the district court instructed the jury that the State was required to prove beyond a reasonable doubt that Stark remained in the dwelling without authority—with the intent to commit aggravated battery—while a human being was in the residence. Because Stark challenges the specific element that he remained in the house "without authority," we must determine whether the State presented sufficient evidence to show that Stark was not authorized to remain in the house.

A review of the record shows there was evidence presented by the State at trial to establish that Stark was authorized to be in the house because Ellis had hired him to help with the remodeling. During direct examination, the prosecutor asked Ellis about his arrangement with Stark:

14

"Q. Okay. Now, after [Stark] had left earlier on that Thursday afternoon into Thursday evening, did you expect him back at the house?

"A. I did. I was hoping he'd start [working] that night, but as it got later I just assumed he'd probably show up in the morning if he showed at all.

"Q. Did [Stark] have permission to enter that house in those early morning hours and attack you?

"A. Yeah. We had a thing where he was supposed to come work, you know, but he—but he was supposed to come work, not not work.

"Q. Did he have a key or did he know the code to enter the house to your knowledge?

"A. I really honestly don't know how he got in. I thought it was locked, but it may not have been obviously. Either that or [Phenneger] opened the door for him."

Still, the State argues that Stark's authority to remain in the residence was revoked when Stark began attacking Ellis. Although it could be inferred that Ellis would have desired to revoke Stark's permission to remain in the house when he began attacking him, we do not find evidence in the record that would be sufficient to prove beyond a reasonable doubt that Stark's authority to remain in the house was actually revoked. Although the State cites *State v. Gutierrez*, 285 Kan. 332, 172 P.3d 18 (2007), in support of its argument that Stark's permission to remain in the house had been revoked, the facts of that case are distinguishable from the present case because the victim expressly told the defendant to leave her residence. See *State v. Mogenson*, 10 Kan. App. 2d 470, 473, 701 P.2d 1339 (1985) (the defendant may have been let in the residence, but the victim demanded that he leave). On the other hand, the State has not pointed us to any evidence in the record to establish beyond a reasonable doubt that Stark's permission to be in the house was revoked.

It is undisputed that Stark had permission to enter the residence to work on the house. The testimony indicates that the remodeling work was being performed on the house throughout the night because the work was behind schedule. Likewise, Ellis testified that he hired Stark to help with the remodeling and that he expected he might show up to help that night. Because we find no testimony or other evidence that Stark's

15

authority to remain in the residence had been revoked, we conclude that his conviction for aggravated burglary must be reversed for lack of sufficient evidence as to an essential element of the crime.

*Lesser Included Offense Instruction*

The last issue presented by Stark is whether the district court erred by failing to instruct the jury on the lesser included offense of level 7 aggravated battery, which is based on "knowingly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2018 Supp. 21-5413(b)(1)(B). Instead, the jury was only instructed on—and Stark was convicted of—level 4 aggravated battery, which requires a finding of great bodily harm. K.S.A. 2018 Supp. 21-5413(b)(1)(A). In response, the State contends that the lesser included instruction was unnecessary because no evidence was presented at trial that would reasonably justify a conviction for level 7 aggravated battery.

When analyzing jury instruction issues, we apply the following three steps:

"(1) determine whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) consider the merits of the claim to determine whether error occurred below; and (3) assess whether the error requires reversal—in other words, whether the error can be deemed harmless." *State v. Hollins*, 320 Kan. 240, 242, 564 P.3d 778 (2025).

Because Stark requested a lesser included instruction for level 7 aggravated battery at the jury instruction conference, this issue was adequately preserved for review. Moreover, the State concedes that the giving of a level 7 aggravated battery instruction would be legally appropriate because it is a lesser included offense of level 4 aggravated battery. See *State v. Phillips*, 312 Kan. 643, 668, 479 P.3d 176 (2021). Accordingly, we turn to the question of whether the instruction was factually appropriate. In making this

16

determination, we must review the evidence in the light most favorable to the requesting party—in this case Stark—that would have supported the instruction. See *State v. Mendez*, 319 Kan. at 727.

The distinction between level 7 aggravated battery and level 4 aggravated battery is the degree of bodily harm inflicted. K.S.A. 21-5413(b)(1)(A) criminalizes great bodily harm or disfigurement; and K.S.A. 21-5413(b)(1)(B) criminalizes bodily harm with a deadly weapon or in any way which could inflict great bodily harm, disfigurement, or death. Ultimately, the jury found Stark guilty of level 4 aggravated battery which requires a finding of great bodily harm beyond a reasonable doubt. Great bodily harm is defined as "'more than slight, trivial, minor, or moderate harm.'" *State v. Robinson*, 306 Kan. 1012, 1027, 399 P.3d 194 (2017).

Generally, whether a victim has suffered great bodily harm is a question of fact for the jury to decide. *State v. Couch*, 317 Kan. 566, 593, 533 P.3d 630 (2023). Here, the record contains sufficient evidence about the injuries suffered by Ellis as the result of being attacked with a hatchet that could support both severity level 7 aggravated battery and severity level 4 aggravated battery. So, assuming that the requested lesser included instruction was also factually appropriate, we move on to the question of whether the failure to give the instruction was harmless.

Since Stark preserved the issue below, we apply one of two harmless error tests. If the instructional error impacts a constitutional right, an appellate court assesses whether the error was harmless under the federal constitutional harmless error standard, which is whether there was no reasonable possibility that the error contributed to the verdict. When no constitutional right is impacted, an appellate court assesses whether there is no reasonable probability the error affected the trial's outcome in light of the entire record. *State v. Holley*, 313 Kan. 249, 256-57, 485 P.3d 614 (2021).

17

Our Supreme Court has explained that an analysis of why the evidence would more likely support a conviction of the more serious offense is not appropriate in determining whether the lesser included offense is factually appropriate. But that analysis is appropriate in determining whether the error amounted to harmless error. See *Couch*, 317 Kan. at 596. Here, we find the result to be the same regardless of which test is applied.

A review of the record reveals overwhelming evidence against Stark to support his conviction of level 4 aggravated battery because the State presented a plethora of evidence to establish that Ellis suffered great bodily harm. This evidence includes the undisputed fact that Ellis was struck in the face and head with a hatchet multiple times. As a result, Ellis sustained crushing-type injuries as well as deep cuts to his face and head. The attack was so severe as to nearly sever Ellis' nose from his face, his sinuses had to be rebuilt, his orbital socket was crushed, and tips of several of his fingers were cut off as he attempted to defend himself. Furthermore, Ellis underwent three plastic surgeries to repair the injuries he suffered during the attack. During these surgeries, 10 plates were placed to reconstruct his face. As such, we have no difficulty in finding that the evidence of "great bodily harm" presented by the State at trial was overwhelming.

Applying either test for harmless error, we find that the failure to give a lesser included instruction does not require reversal of the jury's verdict. Rather, we find that there is no reasonable possibility that the failure to instruct the jury on level 7 aggravated battery contributed to the verdict. Consequently, we find that the alleged instructional error was harmless.

CONCLUSION

In conclusion, we find that Stark failed to preserve the eyewitness identification issue for appeal because he failed to contemporaneously object to the admission of the evidence at trial. In addition, we find the district court acted within its discretion in denying his request to cross examine Ellis on whether he was under the influence of alcohol or drugs on the night of the attack. Even if the district court should have allowed the evidence, we find that Stark's right to a fair trial was not violated by the district court's evidentiary ruling. Given the strength of the State's other evidence, any error in the exclusion of this evidence was harmless.

Further, we find no reasonable possibility that the district court's failure to instruct the jury on a lesser included offense of aggravated battery contributed to the verdict. We do, however, find that the State failed to present evidence on all the elements of aggravated burglary. Specifically, we find that the State failed to prove that Stark did not have permission to remain within the residence. As a result, we reverse his conviction and vacate his sentence for aggravated burglary.

Finally, we find that remand for resentencing is not necessary under the circumstances presented in this case. This is because Stark's aggravated burglary conviction was not his primary crime at sentencing, his post-release supervision term is not affected, and he received concurrent sentences.

Affirmed in part, reversed in part, and vacated in part.